UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 1:18-cr-58-CLC-SKL |
| JEREMY MICHAEL GYURNEK, | ) ) ) |
| Defendant. | ) |

## REPORT & RECOMMENDATION

Before the Court is a motion by Defendant Jeremy Michael Gyurnek ("Defendant"), seeking to suppress all evidence obtained as a result of the search and seizure of his vehicle [Doc. 51]. Plaintiff United States of America ("Government") filed a response in opposition to the motion [Doc. 56]. The motion to suppress was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b) [Doc. 52], and an evidentiary hearing on the motion was held on July 9, 2019. This matter is now ripe.

For the reason addressed below, I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

### I. FACTUAL BACKGROUND

The Government called as a witness Joshua Hodge ("Hodge"), the City of Cleveland, Tennessee Police Department ("CPD") patrol officer who first encountered Defendant on April 3, 2018. Defendant called as a witness Vikram Vashi ("Vashi"), an owner of the Economy Inn in Cleveland where the events at issue took place. Defendant also testified.

Between 4:30 a.m. and 5:00 a.m. on April 3, 2018, Hodge was in uniform on patrol in his marked patrol car. Hodge observed a male—later identified as Defendant—get out of a parked

pickup truck bearing an automobile dealer license tag/plate. Hodge was patrolling the hotel area because his CPD supervisors indicated hotel management had requested an increased police presence due to drug trafficking concerns at the hotel. During a CPD Crime Suppression Unit briefing, Hodge had also been informed that Room 111 was being used in connection with possible illegal drug activity by a suspect named "Casey."

Hodge has been a patrol officer with the CPD since March 2015. Hodge had made several drug-related arrests in the parking lot of the Economy Inn and was familiar with the area on the night in question. Based on his training and experience, Hodge thought it was "irregular" for a vehicle with dealer tags to be in the area. Hodge believed it unlikely that a test drive would occur in the wee morning hours or include a stop at the Economy Inn. He also knew that dealer tags were sometimes used to conceal identity.

As Hodge pulled to a stop in the parking lot, he observed Defendant walk from his truck in the direction of several possible final destinations, including Room 111, an external stairway, and the front office.[1] As pertinent, while still sitting in his parked patrol car about 15 to 20 feet from where Defendant was walking, Hodge initiated contact with Defendant by calling out a greeting, such as "Hey man."

The initial interaction is not recorded and the parties offered conflicting testimony concerning what happened during the initial interaction, which is the crux of the motion. Under Hodge's version of events, after he called out a greeting to get Defendant's attention, Defendant walked over to the patrol car. As Defendant walked over, Hodge activated his body

---

[1] There was extensive testimony and several exhibits dedicated to the location of these various destinations and the relative positions of Hodge and Defendant, but it is not necessary to summarize this evidence to address the pertinent issues.

2

camera/audio.[2]

Under Defendant's version of events, he only came over after being commanded to do so. Specifically, as he walked toward the front office, he noticed someone pulling into the parking lot. As he continued to walk, he heard somebody yell, "Hey man." In response, he looked back and saw a police officer in his patrol car, but kept walking. After he walked a few more paces, the officer hollered, "Hey, come here." Again, Defendant kept walking. Finally, the officer raised his voice and yelled, "Hey man, I said come here." Only in response to this compelling command, did Defendant stop, turn around, and walk back to the officer. Defendant referred to his prior experience with the police, which he indicated fostered his subjective belief that he was not free to leave as a result of Hodge's "command."

What happened next is recorded and undisputed. While still sitting in his patrol car as Defendant walked up, Hodge asked, "You got I.D. on you?" Defendant replied, "Yes sir." Hodge then said, "May I see it please?" Defendant replied that his identification was in his truck. Hodge remained in his patrol car, and Defendant turned and walked back toward his truck. Hodge called out for Defendant to "hold up," but Defendant kept walking to his truck. Hodge exited his patrol car and followed Defendant to the truck.

After Officer Hodge caught up to Defendant at the truck, Hodge commented that it was a nice truck and Defendant replied congenially. When asked, Defendant told Hodge his name. Hodge replied that he knew Defendant's brother. Defendant opened the driver's door and began

---

[2] From this point forward, the pertinent events are recorded and the recording was made an exhibit. Hodge initially testified CPD policy requires activation of his body camera whenever he is speaking to the public. He later explained that nothing in the policy requires him to activate his camera before he says anything to a subject; instead, the camera must be activated during an encounter with the public. Hodge noted the process of parking his patrol car, rolling down his window, initiating the conversation with Defendant, and activating his camera all happened relatively quickly.

3

searching inside the truck but he was having difficulty finding his identification. Defendant spontaneously volunteered his social security number. Hodge shined his flashlight into the floorboard and driver's door area. Defendant touched and moved a large sheathed fixed-blade knife that was in the pocket of the door more than once. As Defendant was doing so, Hodge could see in plain view several syringes in the pocket of the door. In response, Hodge grabbed Defendant's arm and ordered him to put his hands behind his back. Defendant reacted by struggling and protesting, "What are you doing? I don't have any warrants on me."

What happened next is of little relevance to the motion to suppress. As Hodge attempted to place handcuffs on Defendant, a violent struggled ensued. Hodge's body camera was knocked to the ground. Defendant fled, and after two short chases, Hodge managed to tackle Defendant and a struggle on the ground ensued. Hodge deployed his taser on Defendant several times, and in the struggle, Hodge received some of the stunning effects of the taser deployment. Hodge and other officers eventually searched the truck and Defendant's person and found syringes and drugs in the truck, and a loaded gun, more drugs, and cash ($476) on Defendant's person. A few days later, Hodge determined the dealer tag on the truck was stolen.

Hodge prepared an initial incident report. At the request of his supervisors a few days later, Hodge prepared a supplemental incident report to provide more details of his initial encounter with Defendant and why he was patrolling the Economy Inn area. Although Hodge was questioned about the reports, they were not entered into evidence.

Vashi testified he personally did not ask for increased patrols from the CPD to address crime in the area, but he also confirmed that an employee of the Economy Inn had requested increased CPD patrols. Vashi also reported that he had been "pulled over" while walking in the Economy Inn parking lot once and asked for identification by a CPD patrol officer.

4

In addition to the testimony described above, Defendant explained that he lived in Knoxville, Tennessee but he was from Cleveland and had a brother still living there. Defendant described driving to Cleveland from Knoxville on April 2, 2018, in a truck that he "purchased" a few days prior. According to Defendant, a few days prior to April 2, Defendant traveled to Cleveland from Knoxville (he had no vehicle and could not explain how he got to Cleveland) and bought the truck from a "girl" that "a friend" knew (he could not identify the girl, did not identify the friend, and also indicated the truck was owned by the nameless girl's unidentified boyfriend and the girl was selling it because she was mad at the boyfriend). He paid the girl an initial cash payment of about $500 and agreed to pay a total price of around $2,500. He did not get a title to the truck, but thought he would when he paid the rest of the purchase price to the girl. He then returned to Knoxville.

As noted above, Defendant drove the truck back to Cleveland on April 2, 2018. He admitted using methamphetamine that afternoon. He had been awake since that use (i.e., he had not slept that night) when he encountered Hodge at the Economy Inn (around 4:45 a.m. on April 3, 2018). He claimed he was at the Economy Inn merely to rent a room for a week because he hoped to be hired to work at a construction job in the Cleveland area. He had been unemployed for about two months and some "friends" said they could help him get a construction job. Defendant could remember little to no details regarding this job prospect and initially could not identify the friends, although he eventually recalled the name of one of the friends. He thought he had his wallet with him that night, but knew he did not have a driver's license because it had been suspended. He testified that he had $476 cash with him to pay for the hotel room he wanted to rent for the week.

Defendant was indicted on charges of possession with intent to distribute 50 grams or more

5

of a methamphetamine mixture (Count One), possession of a firearm in furtherance of a drug trafficking offense (Count Two), and possession of a firearm by a felon (Count Three).

## II. ANALYSIS

Defendant asserts that the police violated his Fourth Amendment rights because he was seized/detained when he first attempted to walk away from Hodge.[3] Defendant argues Hodge's "command" that he "come over" after Defendant attempted to keep walking away was an unconstitutional seizure—that is, a *Terry* stop unsupported by reasonable suspicion.[4] The Government submits that the initial encounter was merely consensual, not an illegal *Terry* stop.

As relevant to the Fourth Amendment issues raised in the motion to suppress, encounters between police and citizens can be grouped into three types: "(1) consensual encounters in which

---

[3] There is no dispute that Hodge saw the drug paraphernalia in plain view in the truck as Defendant searched for his identification and that possession of drug paraphernalia is an arrestable misdemeanor offense. *See* Tenn. Code Ann. § 39-17-425(a); *State v. Clark*, No. W2012-02507-CCA-R3CD, 2014 WL 287613, at *4 (Tenn. Crim. App. Jan. 24, 2014); *see also Denton v. Rievley*, 353 F. App'x. 1, 4 (6th Cir. 2009) ("a warrantless . . . misdemeanor arrest in a public place does not violate the Fourth Amendment." (footnote omitted) (citing *Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001)). Likewise, there is no disagreement that when Hodge grabbed Defendant's arm immediately upon seeing the paraphernalia, Defendant was properly subject to seizure/detention. The Government argued alternatively in its brief that if Defendant's characterization of the initial encounter as a *Terry* stop is determined to be correct, then the stop was supported by reasonable suspicion. The Government argued in the second alternative that even if the initial stop is determined to be a *Terry* stop unsupported by reasonable suspicion, then the good faith exception applies to thwart exclusion.

[4] Pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), "where a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the suspicious circumstances." *United States v. Bentley,* 29 F.3d 1073, 1075 (6th Cir. 1994). An officer who decides to conduct a *Terry* stop must be acting on more than his or her "inchoate and unparticularized suspicion or 'hunch;'" rather, they must rely on "specific reasonable inferences" which they are "entitled to draw from the facts *in light of [their] experience.*" *Terry,* 392 U.S. at 27. "That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow,* 490 U.S. 1, 7 (1989). "[A] pattern of suspicious behavior need only be recognizable by one 'versed in the field of law enforcement.'" *United States v. Knox,* 839 F.2d 285, 290 (6th Cir. 1988) (quoting *United States v. Cortez,* 449 U.S. 411, 418 (1981)).

6

contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or *Terry* stop which must be predicated upon reasonable suspicion; and (3) arrests which must be based upon probable cause." *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009) (quotation marks omitted) (quoting *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008)). Generally, if a seizure is not conducted in compliance with the Fourth Amendment, all evidence obtained as a result of the seizure must be suppressed. *See United States v. Gross*, 550 F.3d 578, 583 (6th Cir. 2008) ("Evidence and statements obtained from [an] illegality must be excluded as 'fruit of the poisonous tree.'" (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963))).

While "all seizures—including brief investigatory stops—receive [Fourth Amendment] protection," *United States v. Beauchamp*, 659 F.3d 560, 566 (6th Cir. 2011), police questioning, without more, does not constitute a seizure or implicate the Fourth Amendment, *Florida v. Royer,* 460 U.S. 491, 497 (1983). "'[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen.'" *Illinois v. Lidster,* 540 U.S. 419, 425 (2004) (quoting *Royer*, 460 U.S. at 497 (alternation in original)). For that reason, "police questioning, by itself, is unlikely to result in a Fourth Amendment violation." *I.N.S. v. Delgado,* 466 U.S. 210, 216 (1984); *see also United States v. Foster,* 376 F.3d 577, 584 (6th Cir. 2004) (observing a police officer is free to ask a person for identification without implicating the Fourth Amendment).

"[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the

7

officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991). This is a fact-based test. *See Michigan v. Chesternut*, 486 U.S. 567, 573 (1988); *United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004) (holding that a seizure occurs if, "under the totality of the circumstances, a reasonable person would have believed that he or she was not free to walk away." (quotation marks omitted) (quoting *United States v. Saperstein*, 723 F.2d 1221, 1225 (6th Cir. 1983))).

The line between a consensual encounter and a seizure is imprecise, and a consensual encounter can ripen into a seizure. *See United States v. Carr*, 674 F.3d 570, 574 (6th Cir. 2012) ("When the officers asked Carr to exit the vehicle, the encounter transformed from voluntary to compulsory. Once a consensual encounter escalates to the point where the individual is seized, the police officer must have a reasonable suspicion of criminal activity to justify a *Terry* stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth Amendment." (internal quotation marks and citation omitted)). Circumstances that might indicate a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (citing *Terry*, 392 U.S. at 19 n.16) (other citations omitted).

Defendant's motion to suppress can succeed only if Hodge unlawfully detained Defendant during the initial encounter, i.e., prior to the development of (at least) reasonable suspicion. As noted, many of the night's events were recorded, but not the salient initial encounter. It is certain that during the initial encounter, Hodge did not activate his siren or emergency lights, act in a threatening manner, display his weapon, or physically touch Defendant. Instead, Defendant's argument relies on his characterization that Hodge commanded him to come over as he attempted

8

to walk away. Defendant argues this command was made in a tone of voice indicating compliance would be compelled and he subjectively believed he had no choice but to obey.

For Fourth Amendment purposes, the Court must consider whether, under the totality of the circumstances, this initial interaction was so intimidating, threatening, or coercive that a reasonable person would have believed he was not free to leave. *Delgado,* 466 U.S. at 215. As recently held in *Royer*,

> law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed.

*Id*. at 497 (citations omitted).

The United States Court of Appeals for the Sixth Circuit has held that *requests* for an individual to come over to the officer do not constitute a seizure while *commands* might. *Compare United States v. Brown*, 447 F. App'x. 706, 708-09 (6th Cir. 2012) (reasoning that "simply calling out to someone to come over to talk does not constitute a seizure") *with United States v. Johnson*, 620 F.3d 685, 691 (6th Cir. 2010) ("Stopping after being ordered to stop triggers the Fourth Amendment.") and *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (holding that seizure occurred when officer instructed defendant to "just hang out right here for me, okay?"). "Language or tone of voice indicating that compliance" is necessary can be

9

indicative of a seizure. *Mendenhall*, 446 U.S. at 554. As recently held by the Sixth Circuit,

> The distinction between a question and command can be slippery. This court has found language that might be characterized as commands to be requests in the past. *See, e.g.*, *United States v. Campbell*, 486 F.3d 949, 956 (6th Cir. 2007) (holding that an officer's statement, "I'd like to see some ID," was a request); *United States v. Matthews*, 278 F.3d 560, 562 (6th Cir. 2002) (finding that an officer's yell to a defendant, "Hey, buddy, come here," was a "simple request[,] . . . which the defendant could have politely declined"), *abrogated on other grounds by Begay v. United States*, 553 U.S. 137, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008).

*United States v. Cowan*, 704 F. App'x 519, 523 (6th Cir. 2017) (holding "there was no testimony showing that the language used was coercive, merely Rodgers's assertion that 'I asked him if he could move to the side so that I could pat him down' in a cordial manner.") *cert. denied,* 138 S. Ct. 1333, 200 L. Ed. 2d 520 (2018).

I **FIND** that under Hodge's version of events and the applicable precedent, a reasonable person would have believed he was free to leave making the encounter consensual. In contrast, under Defendant's version of events, a reasonable person could have believed he was not free to leave indicating a seizure within the meaning of the Fourth Amendment. As is often the case, the issue turns on the Court's credibility determination.

A court is given wide latitude in making its credibility determinations. *United States v. Haynes*, 301 F.3d 669, 679 (6th Cir. 2002) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-75 (1985)). "In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic." *United States v. Caldwell*, No. 1:13-CR-128, 2015 WL 179583, at *9 (E.D. Tenn. Jan. 14, 2015) (citing *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005)). I **CONCLUDE** Hodge's version of events is the more credible. Hodge's "greeting" or "call over" would have indicated to a reasonable person that

10

Hodge wanted to talk, but was not a command that compelled a person to do so. Hodge's appearance, demeanor, and his consistent, descriptive account of the day's events support finding that he gave credible testimony. *See e.g., United States v. Simmons,* 174 F. App'x 913, 917 (6th Cir. 2006) (finding officers' testimony credible because it was substantively consistent).

Defendant's testimony about the circumstances and events of April 3 was not credible. His explanation about why he was in Cleveland, his plans at the hotel, the recent "purchase" of the truck, and related events all lead to a finding that he was either so impaired he cannot accurately recall the events or he was not being candid. Either explanation destroys his credibility. Moreover, the recording supports—to some degree—that the initial encounter was consensual. Defendant never protested or told Hodge that he did not want to answer questions or attempt to get away until after Hodge saw the syringes in plain view and initiated physical contact. Defendant even freely walks away from Hodge to get his identification from the truck—in spite of Hodge calling out to Defendant to wait up.

Although I find Hodge was a far more credible witnesses than Defendant, I also acknowledge Hodge did not have, and perhaps should have had, his body camera on before his initial greeting. I also acknowledge that Hodge updated his incident report a few days after April 3, in order to provide more detailed information about the initial encounter and his reasons for being in the Economy Inn area at the request of his supervisors. Overall, however, I found his explanation of these matters to be reasonable and, ultimately, not a detraction from his overall credible, consistent, precise, and detailed recall of the April 3 events.

Under the applicable precedent, the totality of the circumstances described in Hodge's credible testimony indicates a reasonable person would believe that he was free to leave or decline to answer. *See, e.g., United States v. Foster*, 376 F.3d 577, 584 (6th Cir. 2004) (consensual

11

encounter when officer asked the defendant his name, what he was doing there, and whether he had any identification on him); *United States v. Matthews*, 278 F.3d 560, 561-62 (6th Cir. 2002) (the defendant was not detained when the officer yelled "Hey buddy, come here."); *United States v. Waldon*, 206 F.3d 597, 603-04 (6th Cir. 2000) (consensual encounter when the officer approached the defendant and asked him what he was doing in the area). To the extent Defendant argues it was reasonable to interpret Hodge's beckoning as a demand this argument fails because, absent other indicia of coercion, even requesting a suspect to "come over" does not transform a consensual encounter into a seizure. *See United States v. Falls*, 533 F. App'x 505, 508 (6th Cir. 2013) (holding officer's "use of the words 'stop' and 'come here,' without any other evidence of coercion, did not convert the consensual encounter into a seizure.").

Moreover, the recording verifies that Hodge also did not activate his emergency lights or siren, act in a threatening manner, display a weapon, physically touch Defendant, or use threatening language or a commanding tone of voice when requesting identification. Furthermore, Hodge was not blocking Defendant's egress. *See United States v. Dingess*, 411 F. App'x 853, 856 (6th Cir. 2011) (consensual encounter when the officers parked their car without blocking the defendant's egress and approached the defendant to initiate conversation (citing cases)). As a result, the encounter remained consensual until a basis for detention ripened. *See Mendenhall*, 446 U.S. at 573-74.

Accordingly, I **CONCLUDE** that the initial interaction between Defendant and Hodge was a consensual encounter for which reasonable suspicion was not required. As a result, the motion to suppress fails and it is not necessary to address the alternative arguments raised in the Government's response.

## III. CONCLUSION

For the reasons stated above, I **RECOMMEND**[5] that Defendant's motion to suppress [Doc. 51] be **DENIED**.

                                                    s/ *Susan K. Lee*
                                                    SUSAN K. LEE
                                                    UNITED STATES MAGISTRATE JUDGE

---

[5] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).