UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No: 1:18-CR-58 |
| v. ) | |
| ) | Judge Curtis L. Collier |
| JEREMY MICHAEL GYURNEK ) | |

## **M E M O R A N D U M**

Defendant, Jeremy Michael Gyurnek, had an encounter with a police officer that was either consensual or an illegal detention. That encounter led to the police officer's seeing drug paraphernalia in plain sight in Defendant's vehicle, which in turn led to Defendant's arrest, and ultimately to Defendant's being charged in this case.

The matter is now before the Court on the report and recommendation (the "R&R") of Magistrate Judge Susan K. Lee, recommending the Court deny Defendant's motion to suppress all evidence that was discovered as a result of that encounter. (Doc. 63.) Defendant objects to the R&R. (Doc. 64.) The United States ("the Government") opposes the objection. (Doc. 65.)

The Court has reviewed the transcript of the evidentiary hearing the Magistrate Judge held on July 9, 2019, the exhibits introduced at the hearing, and the briefs the parties filed before and after the R&R issued. The Court will **ACCEPT** the R&R (Doc. 63). Defendant's motion to suppress (Doc. 51) will be **DENIED**.

### I. BACKGROUND

The R&R begins with a detailed summary of the testimony provided by the three witnesses at the suppression hearing: Officer Joshua Hodge of the Cleveland, Tennessee Police Department; Vikram Vashi, the owner of the Economy Inn at which the events in question took place; and

Defendant. (Doc. 63 [R&R] § I, at 1–6.) The following summary of the factual background is derived from the R&R and the evidence presented at the hearing.

On April 3, 2018, between 4:30 and 5:00 a.m., Hodge was on patrol in a marked police car near the Economy Inn. He was patrolling the area because his supervisors had told him the hotel management had asked for an increased police presence based on concerns about drug trafficking. Hodge had also received information from his supervisors that a male suspect may have been using Room 111 at the Economy Inn for illegal drug activity.

While driving past the parking lot, Hodge saw a man, the Defendant, get out of a pickup truck that had a dealer's license tag on it. Hodge considered this irregular, because it was not a likely time or place for a test drive. He also knew that people sometimes use dealer tags to hide their identity. Hodge testified on direct examination that Defendant was walking towards a door that was near Room 111, but he admitted on cross examination that other destinations were possible, including a staircase or the lobby.

Hodge pulled into the parking lot, stopped his patrol car, rolled down his window, and initiated verbal contact with Defendant. The facts of the initial part of the encounter are the basis of Defendant's motion to suppress. The disputed facts begin with Hodge's first words to Defendant and end when the footage from Hodge's body camera starts.

Hodge testified that Defendant was about fifteen or twenty feet away, walking toward the hotel. Hodge gave a greeting of some kind to get Defendant's attention. Hodge did not remember what greeting he gave, but it was probably along the lines of "Hey, how's it going?" or "What's going on?" Defendant turned and began walking toward the patrol car. While Hodge was parking, rolling his window down, and getting Defendant's attention, Hodge pushed the button to activate

2

his body camera and his dash camera. According to Hodge, the only thing he said to Defendant before the recording started was that single greeting.

Defendant testified that Hodge yelled at Defendant three times before Defendant turned and started walking toward Hodge. Defendant testified that as he was walking toward the front office to rent a room for the week, he heard someone yell "Hey, man." He looked back and saw a police officer in a patrol car, but he kept walking. After a few more paces, he heard "Hey, come here." Defendant kept walking. Then the officer raised his voice and yelled "Hey, man, I said come here." Defendant then turned and started walking back toward the officer because he believed he was not free to leave.

From the time Defendant started approaching Hodge's patrol car on, the events are captured on video and are not in dispute. Hodge asked Defendant if he had identification. Defendant said he did. Hodge asked to see it. Defendant again said yes, and then said it was in his truck. Defendant turned and walked toward his truck. Hodge called out for Defendant to "hold up." Defendant did not wait, but kept walking away from Hodge toward his truck. Hodge got out of his patrol car and followed Defendant to his truck.

At the truck, Hodge shined a flashlight into the vehicle as Defendant looked for his identification. Eventually Defendant got into the driver's seat to search. Defendant moved items around in his truck as he searched, touching and moving a fixed-blade knife in the pocket of the driver's side door more than once. As he did so, Hodge saw several syringes in the pocket of the door. Hodge grabbed Defendant's arm, told him to step out of the truck, and told him to put his arms behind his back. The parties agree that Defendant was under arrest at this point and that Hodge had probable cause for the arrest based on seeing the syringes. Defendant struggled and fled, but was eventually apprehended.

Subsequent searches revealed drugs in the pickup truck and more drugs, a loaded firearm, and cash on Defendant's person. Based on this evidence, Defendant was indicted for possession with intent to distribute fifty grams or more of a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B), possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i), and possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). (*See* Doc. 1.) Defendant filed a motion to suppress on June 12, 2019 (Doc. 51), and the Government responded in opposition on June 27, 2019 (Doc. 56). The Magistrate Judge held a hearing on July 9, 2019. (Doc. 60.)

The Magistrate Judge issued an R&R pursuant to 28 U.S.C. § 636(b)(1)(B) recommending the Court deny the motion to suppress. (Doc. 63.) The R&R first summarizes the testimony and applicable law. The R&R then finds that the issue turns on the witnesses' respective credibility: based on Hodge's testimony, a reasonable person in Defendant's position would have believed he was free to leave, making the encounter consensual; but based on Defendant's testimony, a reasonable person could have believed he was not free to leave, indicating a seizure under the Fourth Amendment. The Magistrate Judge therefore analyzed the witnesses' credibility and concluded that Hodge was the more credible witness and his version of events was more credible than Defendant's. Based on the Magistrate Judge's acceptance of Hodge's version of events, the Magistrate Judge recommended that the Court deny the motion to suppress.

Defendant objects to the recommendation in the R&R. (Doc. 64.) The Government has responded. (Doc. 65.)

## II. STANDARD OF REVIEW

This Court must conduct a *de novo* review of those portions of the R&R or the specified proposed findings or recommendations to which objection is made. 28 U.S.C. § 636(b)(1)(C). But *de novo* review does not require the district court to rehear witnesses whose testimony has been evaluated by the Magistrate Judge. *See United States v. Raddatz*, 447 U.S. 667, 675–76 (1980). The Magistrate Judge, as the factfinder, had the opportunity to observe and hear the witnesses and assess their demeanor, putting him or her in the best position to determine credibility. *See Moss v. Hofbauer*, 286 F.3d 851, 868 (6th Cir. 2002); *United States v. Hill*, 195 F.3d 258, 264–65 (6th Cir. 1999). The Magistrate Judge's assessment of witnesses' testimony is therefore entitled to deference. *United States v. Irorere*, 69 F. App'x 231, 236 (6th Cir. 2003).

In resolving objections, the district court "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

## III. ANALYSIS

Defendant objects to the R&R on three grounds. (Doc. 53.) First, he argues the Government's proof showed not consent, but acquiescence. Second, he argues the Magistrate Judge's credibility determination was flawed because it did not resolve credibility problems with Hodge's testimony. Third, he argues the Magistrate Judge erred in applying the case law on which she relied. Because the Court's analysis necessarily depends on the facts of the encounter, and because the findings of fact depend on the credibility of the witnesses, the Court considers Defendant's credibility argument first.

A.  **Credibility**

Defendant argues the Magistrate Judge erred in determining that Hodge was more credible than Defendant. The Magistrate Judge's assessment of the witnesses' testimony during the hearing before her is entitled to deference. *See Irorere*, 69 F. App'x at 236.

Defendant testified that he was driving a truck with dealership plates because he had just bought the truck a few days before. He did not testify that he had bought it from a dealership, however, but from a woman he did not know through a friend he did not identify. He explained the woman was selling the truck because she was mad at her husband or boyfriend, but that she would get the title from her husband or boyfriend to give to Defendant after Defendant paid the full price. Defendant had paid her five hundred dollars in cash; he expected to get the title after he paid approximately two thousand dollars more through his unnamed friend.

Defendant also testified about the location of the truck purchase. Although he lived in Knoxville at the time, he bought the truck in Cleveland. Defendant did not have a working vehicle when he bought the truck, and he could not remember how he had gotten from Knoxville to Cleveland to buy it in the first place.

Defendant testified that he had used methamphetamine on the afternoon of April 2, 2018. He had not slept between then and when he encountered Hodge in the Economy Inn parking lot early in the morning on April 3.

Defendant testified that he arrived at the hotel in Cleveland from Knoxville between 4:30 and 5:00 a.m. planning to rent a room for a week. He wanted a room for a week because he was hoping to be hired for construction work in Cleveland through the help of some friends he was going to meet on the afternoon of April 3. Defendant could not provide any details of the

6

construction work, nor could he initially name any of the friends. After several pages worth of questions, he ultimately remembered the name of one of these friends.

In analyzing Defendant's and Hodge's respective credibility, the Magistrate Judge explained that Defendant's "explanation about why he was in Cleveland, his plans at the hotel, the recent 'purchase' of the truck, and related events all lead to a finding that he was either so impaired he cannot accurately recall the events or he was not being candid. Either explanation destroys his credibility." (Doc. 63 at 11.) Defendant objects, however, arguing that the Magistrate Judge failed to resolve two problems with Hodge's testimony.

The first problem Defendant alleges relates to Hodge's testimony about where Defendant was walking before Hodge called out to him. Defendant asserts that "[t]he truthfulness of Officer Hodge's statements that he saw Defendant heading towards a room known for drug trafficking was brought into question when he admitted that because the motel room doors were inside the motel and not visible from the parking lot, it was impossible to know where Defendant was walking." (Doc. 65 at 7–8.)

Hodge did not give the testimony Defendant criticizes. On direct examination, Hodge testified Defendant "was walking towards a particular door on the side of the building." (Tr. at 30.) When asked about that door, Hodge testified that "Room 111 was known to have a lot of drug traffic, *which is right next to that door*, with a male that operated under the moniker of KC." (*Id.* (emphasis added).) This answer is convoluted, but it nevertheless conveys that Hodge believed Defendant was walking towards a door next to Room 111. On cross examination, it was apparent that Defendant's counsel had, understandably, misunderstood Hodge's testimony on direct as being that he saw Defendant heading toward Room 111 itself. Hodge, however, continued to testify on cross consistently with what he had said on direct:

7

> Q: So you're saying . . . you saw him headed to a room known for drug activity, Room 111, correct?
>
> A: I said that he was headed towards a door where that room is located.
>
> Q: That's not the way I recall your testimony, but, either way, you couldn't possibly have seen him go into Room 111 from where you were, right?
>
> A: No, sir.

(*Id.* at 53.) Hodge further agreed on cross-examination that he could not see any of the room numbers or the doors to the rooms from the parking lot, that rooms other than Room 111 were accessible through the particular door towards which Hodge saw Defendant walking, and that Hodge's direction was also consistent with walking toward the lobby or a staircase. (*Id.* at 51–56.)

Hodge's testimony on direct and cross-examination were consistent as to where he saw Defendant walking—toward a door that was next to Room 111. Given the qualified nature of his testimony on direct, Hodge's admission that other destinations were in that direction as well does not destroy his credibility. This is especially true given the deference due to the Magistrate Judge's credibility determinations and the serious credibility issues with Defendant's testimony.

The second credibility problem Defendant alleges is that Hodge violated his department's policy by not activating his body camera before he spoke to Defendant for the first time. The Magistrate Judge expressly noted this issue, however: "Although I find Hodge was a far more credible witness than Defendant, I also acknowledge Hodge did not have, and perhaps should have had, his body camera on before his initial greeting." (Doc. 63 at 11.) The Magistrate Judge nevertheless explained that, overall, she "found his explanation of these matters to be reasonable and, ultimately, not a detraction from his overall credible, consistent, precise, and detailed recall of the . . . events." (*Id.*) The Court agrees. Therefore, giving due deference to the Magistrate

Judge's credibility determination, which took the body-camera policy into account, the Court will overrule Defendant's objection on these grounds.

**B.     Acquiescence**

Defendant argues the Government's proof showed only acquiescence, not consent. The Court reviews this argument *de novo*. 28 U.S.C. § 636(b)(1)(C).

Defendant relies on *United States v. Worley*, 193 F.3d 380 (6th Cir. 1999), to argue he only acquiesced to Hodge's authority. In *Worley*, an officer became suspicious of a defendant in an airport. The officer questioned the defendant and asked if he could look in one of the defendant's bags. After a pause, the defendant said, "[Y]ou've got the badge, I guess you can." *Id.* at 383. The Court of Appeals for the Sixth Circuit upheld the district court's determination that this statement was not "an unequivocal expression of free and voluntary consent," but rather "an expression of futility in resistance to authority." *Id.* at 384. The district court and the appellate court both considered the context of the defendant's statement in coming to this conclusion. Among other things, they considered the defendant's prior unsuccessful attempt to convince the officer of the documented fact that his airline ticket was not a one-way ticket. *Id.* at 384, 386.

As the R&R explained, there are three types of permissible encounters between police and citizens for purposes of the present motion: "(1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or *Terry* stop which must be predicated upon reasonable suspicion; and (3) arrests which must be based upon probable cause." (Doc. 63 at 6–7 (quoting *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009)).) The Magistrate Judge concluded the encounter between Defendant and Hodge was the first, a consensual encounter.

9

Consent to a search requires more than acquiescence to an officer's apparently valid assertion of lawful authority. *See Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968). In *Bumper*, a homeowner's response of "[g]o ahead" when told by officers that they had a warrant to search her house was held not to be consent: "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." *Id.* at 550. The *Bumper* rule on acquiescence makes sense. Without it, an officer could falsely say he had a warrant, carry out an illegal search, then wrap the search in a blanket of consent merely because the subject of the search did not put up a fight.

It is not the mere assertion of authority to carry out an action that makes consent invalid, however. *See United States v. Parrish*, -- F.3d. --, No. 18-3446, 2019 WL 5655760, at *4 (6th Cir. Nov. 1, 2019). Rather, an assertion of authority "renders consent invalid only 'if under all the circumstances it has appeared that the consent was not given voluntarily—that it was . . . granted only in submission to a claim of lawful authority.'" *Id.* (alteration in original) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 233 (1973)). The inquiry, then, is whether consent was given voluntarily or only in submission to a claim of authority.

For consent to be voluntary, it must be "unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998) (quoting *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir. 1977)). Voluntariness depends on the totality of the circumstances. *Id.* To distinguish between a defendant's consent and mere acquiescence, a court should examine the defendant's characteristics, the characteristics of the detention, and the nature of the consent itself. *Harris v. Klare*, 902 F.3d 630, 639 (6th Cir. 2018) (quoting *Ivy*, 165 F.3d at 402). Relevant characteristics of the defendant include age,

intelligence, and education; whether the defendant understands he has the right to refuse consent; and whether the defendant understands his constitutional rights. *Ivy*, 165 F.3d at 402. Relevant characteristics of the detention include "the length and nature of detention; the use of coercive or punishing conduct by the police; and indications of more subtle forms of coercion that might [cause a] flaw [in] [an individual's] judgment." *Id.* (last alteration in original). The alleged consent itself may include verbal and non-verbal conduct. *Harris*, 902 F.3d at 639.

The totality of the circumstances here indicate consent, not mere acquiescence by Defendant. Regarding Defendant's relevant characteristics, he is an adult, and there is no reason to think this was his first encounter with law enforcement, given that he is alleged to have a prior felony conviction. There is no specific information regarding his intelligence or education to weigh. As to whether he understood his constitutional rights and whether he knew he had the right to refuse consent, the Court notes that when Defendant went to his truck to look for his identification, he did not comply with Hodge's request that he "[h]old up." This tends to indicate both that Defendant knew he had not been seized and that he knew he did not have to do what Hodge asked of him.

The Court next considers the characteristics of the alleged detention. "[T]he length of detention before consent is a significant factor in any voluntariness determination." *Ivy*, 165 F.3d at 402. The time here was short: fewer than twelve seconds elapsed between Hodge's asking Defendant if he had identification and Hodge's exiting his patrol car to follow Defendant to his truck. (Gov't Ex. 1.) Adding the time it would have taken Hodge to call out to Defendant to get his attention at the start of the encounter, that is still a very short time. *See generally Ivy*, 165 F.3d at 402 (consent not valid where, among other things, approximately one and a half hours passed between detention and consent).

Nor do the other circumstances indicate coercion, whether subtle or otherwise. The entire encounter took place in a public parking lot. Hodge remained seated in his patrol car until after Defendant walked away from him to look for his identification. There was only one law enforcement officer present. *See generally Harris*, 902 F.3d at 640–41 (finding fact issue as to validity of consent where there were six police vehicles at the scene, among other facts), and *Worley*, 193 F.3d at 383 (affirming finding of acquiescence where two officers were present, among other facts). Hodge did not touch Defendant until he initiated the arrest. *See generally United States v. Beauchamp*, 659 F.3d 560, 572 (6th Cir. 2011) ("A scared, defenseless man is not in a position to say no to a police officer whose hands are still on or just removed from his body while another officer is standing just a few feet away.") Hodge never touched his weapon. *See generally Harris*, 902 F.3d at 641 (finding fact issue as to validity of consent where officer repeatedly touched her semi-unholstered weapon, among other facts). Nor did Hodge make a show of authority of the type in *Bumper*, 391 U.S. at 546, where officers said they had a search warrant, or in *Ivy*, 165 F.3d at 402–403, in which the officer said he would get a search warrant, that everyone in the house would go to jail in the meantime, and that the baby would go into protective custody. The Court recognizes that conduct need not be as extreme as in any of the foregoing examples to constitute coercion. However, the Court sees no evidence of coercive circumstances here at all.[1]

Third, Defendant's verbal and non-verbal conduct indicate consent, not mere acquiescence in the face of a show of authority. Defendant immediately answered "Yes, sir," to Hodge's

---

[1] The Court also notes that, under the facts as the Magistrate Judge has found them and as the Court has accepted, there was very little in the way of a show of authority by Hodge to begin with. He was in uniform in a patrol car; he initiated contact with Defendant by calling out a greeting; and he asked Defendant if he could see his identification.

questions if he had identification and if Hodge could see it. This differs significantly from the defendant's statement in *Worley*, a pause followed by "you've got the badge, I guess you can." *Worley*, 193 F.3d at 383. It is certainly possible for a prompt answer of "Yes, sir," to result from mere acquiescence, but here there are simply no other indications of coercion to start with. Defendant's non-verbal conduct supports consent, as well. Defendant walked to his truck himself to look for identification, neither asking permission of Hodge to walk away from the patrol car nor waiting for Hodge when Hodge asked him too.

Finally, Defendant points out that the owner of the hotel, Vikram Vashi, testified that he was once stopped and asked for identification as he was walking in the parking lot of the hotel. Defendant argues this "suggests that the police may be inclined to demand identification from far more than just people driving vehicles with dealers' tags and plates in the early hours of the morning." (Doc. 64 at 8.) Hodge never testified that Defendant's set of circumstances were the only ones he might want to investigate, however; the Court would be surprised if they were. Whatever the facts of the stop of Mr. Vashi may have been, they do not change Defendant's encounter with Hodge from consensual to unlawful.

The Court will overrule Defendant's objection based on acquiescence.

### C. Misapplication of Case Law

Last, Defendant argues Hodge's conduct in this case went beyond the conduct described in the cases on which the Magistrate Judge relied. He argues Hodge "went beyond a mere 'stop' and 'come here.' He repeatedly demanded that Defendant identify himself. The repeated nature of his demands is the 'use of language or tone of voice' indicating that compliance was compelled." (Doc. 64 at 9 (citations omitted).)

Defendant's reliance on the "repeated" nature of Hodge's "demands" is misplaced. Defendant testified that Hodge yelled at him three times to get him to walk over to the patrol car, and he similarly recites in the Facts section of his objection that Hodge yelled at him more than once to make him walk over to the patrol car. (*See* Doc. 64 at 1–2.) But the Magistrate Judge rejected Defendant's testimony on these points, crediting instead Hodge's testimony that he called out to Defendant only once before starting the recording. Nor does the Court see in Hodge's subsequent questions to Defendant about identification a "use of language or tone of voice" indicating Defendant was required to comply. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (describing circumstances that might indicate a seizure as including "the use of language or tone of voice indicating that compliance with the officer's request might be compelled"). The Court accordingly overrules Defendant's final objection.

## IV. CONCLUSION

After reviewing the record, the Court will **ACCEPT** the R&R (Doc. 63) and **DENY** Defendant's motion to suppress (Doc. 51).

**AN APPROPRIATE ORDER WILL ENTER.**

**/s/**
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**